Albert Steven BUSHNELL, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6944.

Court of Appeals of Alaska.

July 21, 2000.

---

1. See Risher v. State, 523 P.2d 421, 424–25 (Alaska 1974); State v. Jones, 759 P.2d 558, 575 (Alaska App.1988).

2. State v. Jones, 759 P.2d at 573.

Sharon Barr, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Kenneth M. Rosenstein and Ben M. Herren, Assistant Attorneys General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

1. AS 28.35.030(a)(1), (a)(2), & (n).

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## *O P I N I O N*

COATS, Chief Judge.

Following a jury trial, Albert Steven Bushnell was convicted of felony driving while intoxicated (DWI).[1] During the trial, the state admitted evidence of his breath test which indicated that his breath alcohol content (BAC) was .109 percent. Alaska Statute 28.40.060 provides that:

> Except for an offense under AS 28.35.280, if an offense described under this title requires that a chemical test of a person's breath produce a particular result, and the chemical test is administered by a properly calibrated instrument approved by the Department of Public Safety, the result described by statute is not affected by the instrument's working tolerance.

Bushnell argues that AS 28.40.060 violates his due process rights because it allows the Department of Public Safety to approve any instrument, even one which is very inaccurate, to establish his level of intoxication. We conclude, however, that the legislature passed AS 28.40.060 with an awareness of the working tolerance of the Intoximeter 3000, a testing instrument that the Department of Public Safety has used for many years and which has a working tolerance of .01 percent. Accordingly, we conclude that AS 28.40.060 does not violate Bushnell's due process rights.

*Facts and proceedings.*

Bushnell's DWI offense was the result of events that took place on July 18, 1997. An argument occurred while Bushnell was drinking with Tina Gratias and Esther Schermerhorn at Gratias' apartment. Eventually, Bushnell was asked to leave. When he would not, Gratias threatened to call the police. After Bushnell tore one of the apartment's telephones off of the wall, Gratias went to a neighbor's apartment and called the police. Bushnell then left the apartment.

Before leaving the area, however, he broke the windshield of Gratias' vehicle. After breaking the windshield, Bushnell rode away on a bicycle.

He soon returned, however, and a neighbor saw him driving a car in the area. The police then arrived, and soon found Bushnell walking in the area. He fled into some nearby woods, but—after a short time—was apprehended.

The arresting officers, Rodney Ryan and Scott Nissen, testified that they saw signs that Bushnell was intoxicated—his eyes were bloodshot and watery, and he had a moderate to strong odor of alcohol. Although Bushnell initially would not consent to field sobriety tests, Nissen persuaded Bushnell to submit to the horizontal gaze nystagmus (HGN) test. According to Nissen, the HGN showed that Bushnell was under the influence of alcohol. Bushnell was then turned over to Officer Daniel Nix, who took custody of Bushnell and then administered an Intoximeter test.

*Discussion*

*Does AS 28.40.060 violate Bushnell's state and federal rights to due process?*

■ We start our analysis with *Haynes v. State, Dep't of Public Safety*,[2] an administrative license revocation case which involved a claim similar to Bushnell's. In *Haynes*, the Intoximeter test results showed that Haynes' BAC was .106 percent. In challenging the administrative revocation of his license, Haynes claimed that in light of the Intoximeter's inherent error of .01 percent, his actual BAC was somewhere between .096 and .116 percent. He argued that the test result was therefore insufficient to satisfy the burden of proof necessary to impose the license revocation. The supreme court ultimately held that the margin of error must be applied in Haynes' favor. In doing so, the court found that:

There is no indication that the legislature considered the .01 margin of error inherent to the Intoximeter 3000 in setting the legal limit at .10 grams per 210 liters of the person's breath. Therefore, we do not interpret AS 28.35.030(a)(2) as creating an offense for violation of the statutory .10 grams per 210 liters of breath, without regard to the margin of error inherent to the particular testing device utilized. In Alaska, a driver commits a DWI offense when his or her actual alcohol level exceeds .10 grams per 210 liters of breath.[3]

In reaching its conclusion, the *Haynes* court reiterated its decision in *Barcott v. State, Dep't of Public Safety*,[4] where it had also held that because there was "no evidence or indication" that the legislature had considered the Intoximeter's inherent margin of error, then the margin of error must be considered by the fact finder.[5] But the *Haynes* court also indicated that the legislature had the power to base the offense of DWI on a particular test result, and that a margin of error that it considered "tolerably inaccurate" could be disregarded.[6]

Following *Haynes*, the legislature enacted AS 28.40.060. When enacting AS 28.40.060, the legislature not only had the *Haynes* decision for guidance, it also had the Intoximeter's long history of use in this state. The Intoximeter 3000 first appeared in reported Alaska case law in 1984;[7] the Intoximeter's working tolerance (or margin of error) of .01 percent is likewise well-known, and was first acknowledged in our reported cases in 1986.[8] With this long-standing historical framework as a backdrop, it is clear that when the legislature responded to *Haynes* with AS 28.40.060, it did so knowing that the Intoximeter 3000 was the testing instrument at issue, and that its working tolerance was .01 percent. Based on this historical framework, we conclude that the legislature, by responding

2. 865 P.2d 753 (Alaska 1993).

3. *Id.* at 756.

4. 741 P.2d 226, 230 (Alaska 1987).

5. *Haynes*, 865 P.2d at 755.

6. *Id.*

7. *See Anchorage v. Flack*, 685 P.2d 108, 109 (Alaska App.1984); *McCracken v. State*, 685 P.2d 1275, 1276 (Alaska App.1984).

8. *See Kalmakoff v. Anchorage*, 715 P.2d 261 (Alaska App.1986); *Ansay v. State*, 715 P.2d 1194, 1195 (Alaska App.1986).

to *Haynes* with AS 28.40.060, implicitly found that a working tolerance of .01 percent of a properly calibrated instrument was "tolerably inaccurate."

Additionally, we recently recognized in *Mangiapane v. Anchorage* that "[t]he Alaska Legislature reacted to the *Haynes* decision by enacting AS 28.40.060." [9] We said that the practical effect of AS 28.40.060 was to modify the definition of driving while intoxicated under AS 28.35.030(a)(2). We held that AS 28.40.060 rejected the interpretation from *Haynes* that "the State had to prove, by means of a chemical test, that the driver's blood *actually* contained at least .10 percent alcohol by weight, or that the person's breath *actually* contained at least .10 grams of alcohol per 210 liters." [10] We stated:

> AS 28.40.060 effectively declares that a driver violates AS 28.35.030(a)(2) if, within four hours of driving, the driver is tested on a properly calibrated, properly functioning Intoximeter and the driver's *test result* is at least .10 percent blood-alcohol or the equivalent .10 grams of alcohol per 210 liters of breath. The fact that the driver's true blood-alcohol or breath-alcohol level may be slightly lower (due to the Intoximeter's acknowledged margin of error) is no longer relevant to the driver's guilt under AS 28.35.030(a)(2). [11]

We concluded that the defendant in *Mangiapane* was not entitled to the jury instruction he sought—that the working tolerance be applied in his favor—because the "margin of error (the machine's 'working tolerance') had no relevance to the jury's decision." [12]

Although Bushnell argues that AS 28.40.060—by not specifying the Intoximeter (or any other instrument)—creates the potential for a varying statutory blood alcohol level, nothing in the history of DWI enforcement in Alaska, nor in the *Haynes* decision, supports this argument. There is no indication that the legislature intended to create a

statutory blood alcohol level that varied depending upon the instrument used by the state, nor is there any indication that the legislature intended to use this statute to delegate to the Department of Public Safety the authority to set the statutory blood alcohol level for DWI in Alaska.

If the Department of Public Safety approved a less accurate testing instrument without an express legislative finding it might create the due process problem Bushnell raises in this appeal. It seems unlikely, however, that the state would begin using a less accurate testing instrument. [13] Since such a scenario seems unlikely, we see no reason to resolve it at this time.

In light of the history of the Intoximeter and its established working tolerance, the discussion in *Haynes,* and the language of AS 28.40.060, it seems clear to us that the legislature implicitly decided that a .01 percent working tolerance was "tolerably inaccurate," and, therefore, irrelevant to the driver's guilt under AS 28.35.030(a)(2). [14] Accordingly, we conclude that AS 28.40.060 does not violate Bushnell's state or federal due process rights.

### Does AS 28.40.060 violate Bushnell's state and federal rights to equal protection?

■ Bushnell next contends that AS 28.40.060 violates the state and the federal equal protection clauses because it exempts those aged 14 to 21 who are charged under another statute. Bushnell asserts that it is unfair that a testing instrument's working tolerance is relevant in cases where minors are charged with operating a vehicle after consuming alcohol, but not in cases where adults are charged with DWI.

Alaska Statute 28.40.060 does create an exception for minors who, under AS 28.35.280, are charged with operating or driv-

---

9. 974 P.2d 427, 429 (Alaska App.1999).

10. *Id.* at 430 (emphasis in original).

11. *Id.* (emphasis in original) (AS 28.35.030(a)(2) is the .10 theory of DWI).

12. *Id.*

13. *See Haynes,* 865 P.2d at 755 n. 3 ("An 'acceptable' margin of error is one having reasonable limits. A greater margin of error could not be conveniently ignored, without inviting a constitutional challenge").

14. *See Mangiapane,* 974 P.2d at 430.

ing a motor vehicle after having consumed any quantity of alcohol. The offense under AS 28.35.280, however, is essentially a much more restrictive version of the DWI offense Bushnell was charged with. Under AS 28.35.280, minors commit an offense if they operate a motor vehicle after consuming *any* alcohol. Therefore, Bushnell has no basis to contend that minors are treated more favorably because minors are in fact subject to a stricter law. Accordingly, we conclude that there is no equal protection violation.

*Should the jury have been instructed that the Intoximeter's margin of error must be applied in Bushnell's favor?*

Relying on *Haynes*, Bushnell's final claim is that the jury should have been instructed to apply the Intoximeter's margin of error in his favor. In light of our holding, however, Bushnell was not entitled to this instruction.[15]

*Conclusion*

The conviction is AFFIRMED.

MANNHEIMER, Judge, dissenting.

Somewhere among the offices and cubicles of the State Trooper Crime Detection Laboratory can be found a state official known as the "scientific director of the breath and blood alcohol testing program". Alaska law—specifically, 13 AAC 63.010(a)—directs the Commissioner of Public Safety to appoint the scientific director from among the employees of the Crime Lab, but the precise identity of this official is not easily discoverable: the "Department of Public Safety" section of the Alaska Directory of State Officials contains no listing for the "scientific director of the breath and blood alcohol testing program".[1]

Despite the scientific director's relative anonymity, this official wields considerable power over the motorists of this state. The Alaska Legislature has enacted a statute, AS 28.40.060, that in effect authorizes the scientific director to set the amount of blood alcohol that will make a motorist guilty of driving while intoxicated. The legislature has failed to establish any criteria or policies to guide the scientific director's decision; the scientific director's discretion in this matter is completely unfettered and apparently unreviewable.

Our constitution forbids the legislature from giving administrators "unguided and uncontrolled discretionary power to govern as they see fit."[2] Because AS 28.40.060 gives an executive branch official sole and unfettered discretion to define the amount of blood alcohol that constitutes the crime of driving while intoxicated, I conclude that this statute is an unconstitutional delegation of legislative authority.

*The Alaska Legislature charges the Department of Public Safety with evaluating and approving breath-test machines. This authority is delegated to the scientific director, who has complete discretion in this matter.*

Under AS 28.35.030(a)(2), a person commits the crime of driving while intoxicated if they operate a motor vehicle and if, within the next four hours, a chemical test of their breath or blood shows that their blood alcohol level is .10 percent or higher (or the equivalent .10 grams of alcohol per 210 liters of breath). Motorists' blood alcohol level is most often determined by using a machine to test a sample of their breath.[3]

Originally, the Department of Health and Social Services was in charge of selecting the breath-test machines that would be approved for use by Alaska law enforcement agencies.[4] This function has now been transferred to

---

15. *Id.*

1. *See* Alaska Directory of State Officials (February 2000 edition).

2. *Municipality of Anchorage v. Anchorage Police Dept. Employees Assn.*, 839 P.2d 1080, 1086 (Alaska 1992).

3. *See* AS 28.35.031—032; *but see* AS 28.35.035.

4. *See* former 7 AAC 30.005—190.

the Department of Public Safety.[5]

The Alaska Legislature has not placed any restrictions or conditions on the Department of Public Safety's authority to designate the approved breath-test machine or machines. The legislature has simply stated that, in order for a chemical analysis of a person's breath to be considered valid, "the chemical analysis ... shall have been performed according to methods approved by the Department of Public Safety." [6]

As already explained, the Department of Public Safety has enacted a regulation, 13 AAC 63.010, that calls for the Commissioner to appoint a "scientific director of the breath and blood alcohol testing program" from among the employees of the Crime Lab. Pursuant to this regulation, the scientific director is "responsible for all aspects of the statewide breath and blood alcohol testing program, including the certification of breath test instruments".[7]

As 13 AAC 63.020 explicitly states, the scientific director is in charge of evaluating and approving breath-test machines:

Breath test instruments approved for analysis. The scientific director must approve a type of breath test instrument for use in ascertaining the alcohol content of a breath sample by chemical analysis of the breath. The scientific director will maintain a list of the individual instruments of this type which have been certified under 13 AAC 63.100 as operating within acceptable limits established by the scientific director.

No statute or regulation restricts or guides the scientific director's choice of breath-test machine(s). Most importantly, 13 AAC 63.020 gives the scientific director carte blanche to establish the "acceptable [operating] limits" of these machines—that is, their acceptable working tolerances or margins of error.

The Alaska Supreme Court and the Alaska Legislature debate whether a breath-test machine's margin of error should be weighed in favor of the defendant or in favor of the government. The legislature resolves this debate by enacting AS 28.40.060. This statute declares that, so long as the breath-test machine is properly calibrated (in accordance with the standards set by the scientific director), the government receives the benefit of the machine's margin of error.

The Intoximeter 3000 is a breath-test machine currently approved for use in Alaska. Its recognized margin of error is .01 grams of alcohol per 210 liters of breath. Expressed in terms of blood alcohol, this margin of error translates to .01 percent.[8] Thus, when the Intoximeter 3000 yields a test result of .10 percent blood alcohol, the motorist's true blood alcohol content might be as high as .11 percent or as low as .09 percent.

As explained above, AS 28.35.030(a)(2) states that a motorist is guilty of driving while intoxicated if, within four hours of driving, a chemical test shows that their blood alcohol level is .10 percent or higher. A sibling provision, AS 28.15.165(c), requires the Department of Public Safety to suspend or revoke a person's driver's license "if a chemical test [administered in connection with a DWI arrest] produced a result described in AS 28.35.030(a)(2)"—that is, a result of .10 percent blood alcohol or higher.

In Haynes v. Dept. of Public Safety [9], the supreme court was asked to decide whether this license-revocation statute required proof that the test result was .10 percent or higher, or (alternatively) required proof that the motorist's actual blood alcohol level was .10 percent or higher. The court ruled that the statute required the government to prove the defendant's actual blood alcohol level, and

---

5. See AS 28.35.033(d) and 13 AAC 63.010—100. But see 13 AAC 63.130(b), which declares that "[b]reath test instruments [and] associated equipment [previously] approved [by the Department of Health and Social Services] under 7 AAC 30.005—7 AAC 30.190 remain approved ... unless the scientific director orders otherwise."

6. AS 28.35.033(d).

7. See 13 AAC 63.010(b).

8. See Haynes v. Dept. of Public Safety, 865 P.2d 753, 754 (Alaska 1993).

9. 865 P.2d 753 (Alaska 1993).

thus the defendant was entitled to the benefit of the machine's margin of error.[10]

The supreme court conceded that the legislature "has the power to require the revocation of a driver's license on the basis of a particular test result or reading, despite [the testing machine's] margin of error, [if] the legislature expressly considers that margin [of error] and deems it sufficiently negligible ... that it may be disregarded."[11] But the court concluded that "there was no evidence or indication that the Alaska Legislature considered the margin of error inherent to the Intoximeter 3000."[12] The court noted that

[t]he legislature did not specifically approve the Department's use of the Intoximeter 3000 ..., but rather [generally] authorized the Department to approve satisfactory [testing] techniques, methods, and standards[.] There is no indication that the legislature considered the .01 [percent] margin of error inherent to the Intoximeter 3000 in setting the legal limit. . . .

Haynes, 865 P.2d at 755–56 (citations omitted). Because the legislature did not expressly recognize the Intoximeter 3000's margin of error and expressly declare their intent that this margin of error should be disregarded, the supreme court held that "failure to apply the inherent margin of error of a particular testing device in favor of the person subject to license revocation violates [the] due process [clause of] the Alaska Constitution."[13]

The Haynes opinion was issued on December 30, 1993. Two and a half years later, toward the end of the 1996 legislative session, the legislature responded to Haynes by enacting AS 28.40.060.[14] Under this statute,

if an offense described [in Title 28] requires that a chemical test of a person's breath produce a particular result, and [if]

the chemical test is administered by a properly calibrated instrument approved by the Department of Public Safety, the result described by statute is not affected by the instrument's working tolerance.

As this court recognized in Mangiapane v. Anchorage[15], the practical effect of this statute was to modify the definition of driving while intoxicated under AS 28.35.030(a)(2). Haynes had effectively interpreted the DWI statute to require proof that a motorist's blood actually contained at least .10 percent alcohol. By enacting AS 28.40.060, the legislature rejected this interpretation of the offense and declared that the test result was the determinative fact. An arrested motorist who tested at .10 percent or higher would be guilty of DWI under AS 28.35.030(a)(2) even though the motorist's true blood-alcohol or breath-alcohol level might be lower than the prescribed statutory limit (due to the Intoximeter 3000's acknowledged margin of error). This margin of error was no longer relevant to the driver's guilt under AS 28.35.030(a)(2).[16]

In effect, AS 28.40.060 declares that the government shall receive the benefit of a breath-test machine's margin of error. If the machine's margin of error is .01 percent, then some drivers will be convicted of DWI even though their actual blood alcohol level is as low as .09 percent. If the machine's margin of error is .02 percent, then some drivers will be convicted of DWI even though their actual blood alcohol level is as low as .08 percent. Expressing this rule in general terms: as the working tolerance (i.e., the margin of error) of the approved breath-test machine becomes greater and greater, the amount of actual blood alcohol necessary to convict a driver of DWI becomes less and less.

---

10. See Haynes, 865 P.2d at 756.

11. Id. at 755. The court did, however, express reservation about the legislature's power to disregard a testing machine's margin of error if that margin of error is "[beyond] reasonable limits". Id. at 755 n. 3. The court did not clarify what it meant by "reasonable limits".

12. Id. at 755.

13. Id. at 756.

14. See SLA 1996, ch. 143, § 17.

15. 974 P.2d 427, 429 (Alaska App.1999).

16. See id. at 429–430.

*The scientific director of the Department of Public Safety's breath and blood alcohol testing program has unfettered discretion in selecting the breath-test machines that will be used in Alaska. Now that the legislature has enacted AS 28.40.060, this power of selection amounts to the power to define the level of blood alcohol needed to prove the crime of driving while intoxicated under AS 28.35.030(a)(2). The Alaska Constitution forbids the legislature from granting executive branch officers unfettered discretion to define criminal offenses. Thus, AS 28.40.060 is unconstitutional.*

Under Alaska law, the scientific director has complete discretion to select the breath-test machines that will be used by Alaska law enforcement agencies. Currently, the scientific director has designated the Intoximeter 3000 as the breath-test machine approved for use in Alaska. The Intoximeter 3000's blood alcohol reading can be wrong by as much as .01 percent. Because the legislature has now declared that a motorist's guilt of DWI hinges on the test result, not the motorist's actual blood alcohol content, defendants with blood alcohol levels as low as .09 percent will be convicted of DWI.

This result, in itself, is not a problem. The legislature has the authority to define DWI as driving with a blood alcohol level of .09 percent—or .08 percent, or .05 percent, if they choose.

Moreover, even though the definition of crimes is normally considered a legislative function, the legislature can authorize a regulatory agency to define crimes arising from acts and omissions within that agency's field of regulation. For example, the legislature has delegated this type of power to the Board of Fisheries and the Board of Game. The legislature could conceivably authorize the Department of Public Safety to evaluate the impairing effects of alcohol consumption and then enact a regulation defining the max-imum blood alcohol level that drivers may have before they become guilty of DWI.

But when the legislature delegates power, it must establish criteria for the exercise of that power. "Administrators should not have unguided and uncontrolled discretionary power to govern as they see fit." [17]

The essential inquiry is whether the [legislature has provided specific] guidance [which] sufficiently marks the field within which the administrator is to act[,] so that it may be known whether [the administrator] has kept within [these bounds] in compliance with the legislative will. This question involves a sliding-scale analysis: [as] the scope [of the delegated authority] increases[,] the standards [governing this delegated authority] must be correspondingly more precise.

*Municipality of Anchorage v. Anchorage Police Dept. Employees Assn.,* 839 P.2d at 1085.[18]

For example, in *State v. Fairbanks North Star Borough* [19], the Alaska Supreme Court struck down a statute that granted the governor the authority to withhold money appropriated to state agencies if, at any time during the fiscal year, the governor determined that the State's revenues would be insufficient to generate the budgeted appropriation. This statute was unconstitutional, the court concluded, because the legislature had "articulated no principles ... to guide the [governor].... Most importantly, the executive [was] provided with no policy guidance as to how the cuts should be distributed." [20]

The authority granted to the scientific director of the breath and blood alcohol testing program is similarly open-ended. The legislature has directed the Department to approve one or more breath-test machines for use in Alaska, but the legislature has given the Department no criteria for making its selections. If the company that manu-

**17.** *Municipality of Anchorage v. Anchorage Police Dept. Employees Assn.,* 839 P.2d 1080, 1086 (Alaska 1992).

**18.** Quoting *State v. Fairbanks North Star Borough,* 736 P.2d 1140, 1143 (Alaska 1987).

**19.** 736 P.2d 1140 (Alaska 1987).

**20.** *Fairbanks North Star Borough,* 736 P.2d at 1143.

factures the Intoximeter 3000 were to decide that they could make more money if they used cheaper parts, lowered the price of the machine, and raised its working tolerance to .025 percent, the scientific director would have complete discretion to continue to certify this revised Intoximeter 3000 as the breath-test machine for Alaska. Similarly, the scientific director has complete discretion to decide that the Intoximeter 3000 is too expensive and that it should be scrapped in favor of a cheaper machine with a greater margin of error. Some people might think this decision ill-advised, but no provision of the Alaska Statutes limits the scientific director's discretion. He or she enjoys complete liberty to decide that budgetary constraints make cheaper, less accurate machines more appropriate.

In fact, the scientific director's decision to abandon the Intoximeter 3000, (or to certify the hypothetical new and cheaper version) would not have to be based on budgetary concerns—or any other articulable concerns. There are no criteria governing the scientific director's choice, other than criteria set by the scientific director himself. AS 28.40.060 does not prescribe any particular type of breath-test machine, it does not prescribe any upper limit on a breath-test machine's margin of error, and it does not establish any criteria for selecting a machine or for assessing whether a margin of error is reasonable or acceptable. Thus, the scientific director has unfettered discretion to determine the range of blood alcohol levels that can be prosecuted under the DWI statute.

Before the enactment of AS 28.40.060, the lack of constraints on the scientific director's discretion might not have posed as severe a problem. But following the enactment of AS 28.40.060, a person's guilt of DWI hinges on the breath-test result, and the legislature has announced its before-the-fact ratification of all test results produced by any machine approved by the scientific director. Thus, the scientific director has the sole discretion to determine the amount of acceptable error

in breath-testing. And through this choice, the scientific director establishes (for all practical purposes) the amount of blood alcohol that suffices to prove the crime of driving while intoxicated.

It is true that regulatory agencies (such as the Boards of Fisheries and Game and the Department of Public Safety) have been delegated the authority to enact regulations that define criminal offenses. But their regulations must be enacted in conformity with the Administrative Procedure Act, AS 44.62. This Act requires agencies to notify the public of all proposed regulations (and proposed repeals of regulations), to allow the public to comment on the agency's proposed action, and to keep a record of this public comment.[21] Following the adoption or repeal of a regulation, the agency is required to file a copy of its action with the lieutenant governor[22], and the lieutenant governor has a duty both to apprise the legislature of the agency's action[23] and to codify and publish all regulations so that they are available to the public.[24] In addition, the legislature has the authority to annul any regulation by concurrent resolution.[25] None of these procedural protections apply to the scientific director's approval of a breath-test machine.

For these reasons, I conclude that AS 28.40.060 constitutes an unlawful delegation of legislative power to the scientific director.

*The majority's arguments in favor of the statute*

The majority offers two rationales for upholding the statute. The majority suggests that the statute can be construed narrowly so as to limit the scientific director's discretion. Alternatively, the majority suggests that, even if the statute can not be construed narrowly, we need not strike it down because, so far, it has caused no problems.

First, the majority points out that the legislature enacted AS 28.40.060 in response to the supreme court's decision in *Haynes v.*

---

21. *See* AS 44.62.190—215.

22. *See* AS 44.62.040.

23. *See* AS 44.62.320(b).

24. *See* AS 44.62.130.

25. *See* AS 44.62.320(a).

*Dept. of Public Safety.* *Haynes* discusses one specific breath-test machine (the Intoximeter 3000) having an identified margin of error (.01 percent blood alcohol). From this, the majority infers that the legislature intended AS 28.40.060 to grant only limited authority to the scientific director.

According to the majority, AS 28.40.060 does not ratify the scientific director's *future* choices of breath-test machines, but only the scientific director's current choice (the Intoximeter 3000). In the alternative, the majority suggests that even if the statute was intended to ratify the scientific director's future choices, the statute nevertheless implicitly requires the scientific director to select machines whose margin of error is no more than .10 percent blood alcohol.

I am unconvinced by the majority's construction of the statute. True, AS 28.40.060 was enacted in response to *Haynes.* But this begs the real question: how exactly did the legislature respond?

In *Haynes,* the supreme court explicitly suggested how the legislature might change the law (and thus the *Haynes* result): the court told the legislature that they could achieve the result they wanted by enacting a statute that specifically recognized and approved the Intoximeter 3000 and its .01 percent margin of error.[26]

It would have been easy for the legislature to follow the court's blueprint. But the legislature chose a different course. Instead of enacting a statute that specified a particular machine or a particular maximum acceptable margin of error, the legislature enacted a statute that ratifies the result of "[any] chemical test ... administered by a properly calibrated instrument approved by the Department of Public Safety[, regardless of] the instrument's working tolerance".

This wording indicates that the legislature did not want the scientific director to be bound to a particular machine or a particular margin of error. This wording also indicates that the legislature did not want to bind itself to enact a new statute every time the scientific director approved a new breath-test machine, or to amend the statute if further

research revealed that the Intoximeter 3000 actually had a working tolerance greater than .10 percent. The wording of AS 28.40.060 demonstrates that the legislature wanted to be done with this subject once and for all: they ratified every machine, and every margin of error, that the scientific director might approve. In the absence of identifiable criteria to govern the scientific director's choice, this is unlawful.

The majority offers a second way that the statute may be saved. They point out that, even though the statute may give the scientific director *carte blanche,* the scientific director has not exercised this unfettered discretion in an unreasonable way. Instead, the scientific director has approved the Intoximeter 3000, a breath-test machine with a concededly reasonable margin of error. Because the scientific director has not abused his discretion, the majority suggests that this court should ignore the statute's underlying flaw until the scientific director does something less reasonable.

This approach was specifically rejected by the Alaska Supreme Court in *State v. Fairbanks North Star Borough.* As explained above, that case involved a statute that gave the governor unfettered discretion to reduce the budget of any executive agency if, during the fiscal year, state revenues fell below projections. Arguing in support of the statute, the State pointed out that the two governors who had been granted this budget-cutting authority had exercised their power in a restrained and reasonable way. The court answered that this was irrelevant:

> This [court does not intend] to impugn the motives or good faith of Governors Sheffield and Cowper. Both have interpreted the grant of authority under [the challenged statute] narrowly and have acted in accord with that narrow interpretation. However, the issue ... is not what has been done under the statute; rather it is what can be done. As [the New Mexico Supreme Court] said:
>
> > [W]e find nothing in [the statute] whatsoever to indicate that the legislature

---

**26.** *See Haynes,* 865 P.2d at 755–56.

was granting [only a limited] authority to be exercised [under] the conditions which [the State Board of Finance] says it has imposed on itself. As we read the [statute], the grant [of authority] is absolute and totally devoid of restraints, direction or rules. Accordingly, the fact that [the Board] acted ... under certain self-imposed restraints can in no way serve to supply what has been omitted.

*State ex rel. Holmes v. State Board of Finance,* [69 N.M. 430] 367 P.2d 926 [925], 932 (N.M.1961). The [executive branch's] limited exercise of authority ... cannot save a statute which amounts to legislative abdication.

*State v. Fairbanks North Star Borough,* 736 P.2d at 1143–44.

Thus, even though the scientific director may have acted reasonably in exercising the unfettered discretion granted by AS 28.40.060, this does not save the statute.

The decision in *Fairbanks North Star Borough* stands squarely against this contention. As the supreme court said, the issue is not what *has been* done under the statute; rather, the issue is what *can* be done.

*Conclusion*

For these reasons, I conclude that AS 28.40.060 is an unconstitutional delegation of law-making power to an executive branch officer. Because this statute is invalid, the law regarding breath-test results should return to its status following the supreme court's decision in *Haynes v. Dept. of Public Safety.*

